**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**NORTHWESTERN DIVISION**

| | |
|---|---|
| Dawn Vail, individually and as Trustee for ) | |
| North Dakota Workforce Safety & ) | |
| Insurance, ) | **ORDER DENYING** |
| ) | **MOTION TO DISMISS** |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | Case No. 4:14-cv-008 |
| S/L Services, Inc., ) | |
| ) | |
| Defendant. ) | |

Before the court is a "Motion to Dismiss" filed by defendant S/L Services, Inc. ("S/L

Services"). Defendant argues this action must be dismissed because plaintiff Dawn Vail's ("Vail")

exclusive remedy against it for her work-related injury was recovery from North Dakota Workforce

Safety & Insurance ("WSI"), a state-operated workers' compensation fund. For the reasons set forth

below, the motion is denied.

I.       **BACKGROUND**

The following facts are either uncontested or stated most favorably for Vail. On January 23,

2014, Vail, individually and as trustee for WSI, initiated this action by filing a complaint alleging

one count of negligence against defendant S/L Services. In support of her claim, Vail alleges that

she was injured while working for S/L Services, that her injuries were the result of the negligence

of an S/L Services employee, and that S/L Services is vicariously liable for its employee's

negligence.

Before initiating this action, Vail was awarded WSI benefits for the injury at issue. Vail alleges that she is entitled to pursue the dual remedies of collecting WSI benefits and bringing a civil action because S/L Services failed to comply with the relevant statutes governing WSI coverage.

Before the specific facts of this case are addressed, some discussion of the calculation of WSI premiums provides helpful background. Employers required to maintain WSI coverage must pay an annual premium. See N.D.C.C. § 65-04-04. The amount of an employer's premium is based on the classification of its employees (*i.e.*, the type of work its employees perform) and its payroll information. Id. According to information published on WSI's website and submitted with the parties' briefing, an employer applying for a new WSI account is required to provide its employee classifications and the estimated value of its payroll for the next 12-month period. (Docket No. 9-7, p. 3; see Docket No. 9-2, p. 3). When the new account is established, WSI initially bills the employer for a premium amount based on the estimates provided in the application. (Docket No. 9-7, p. 3; see Docket No. 9-3). At the end of that premium period and each subsequent premium period, the employer is required to report its actual payroll for the 12-month period to WSI in an "Employer Payroll Report." (Docket No. 9-7, p. 3; see Docket No. 9-4). WSI then adjusts the employer's premium by billing for an additional amount if the actual payroll was more than the estimated payroll and issuing a credit if the actual payroll was less than the estimated payroll. (Docket No. 9-7, p. 3; see Docket No. 9-5).

Vail was hired by S/L Services and was injured during the first period that S/L Services had WSI coverage. She was hired and her injury occurred after S/L Services applied for WSI coverage and paid its initial premium and before S/L Services submitted its first 12-month "Employer Payroll Report."

S/L Services submitted its "Application for Insurance" to WSI on August 23, 2012. (Docket No. 9-2). In the application, S/L Services estimated that in the next 12 months, it would have 42 employees and total taxable wages of $976,500.00. (Id. at p. 3). On August 28, 2012, WSI issued S/L Services a "Premium Billing Statement" charging an estimated premium for the period from August 23, 2012 to August 31, 2013. (Docket No. 9-3, p. 2). S/L Services paid the premium by check dated September 4, 2012. (Id. at p. 3). On September 10, 2012, WSI issued S/L Services a "Certificate of Premium Payment" with an expiration date of November 14, 2013. (Docket No. 9-6).

On September 22, 2012, S/L Services hired Vail as a welder's helper. (Docket No. 15-1, p. 5). S/L Services intended to treat Vail as an independent contractor rather than an S/L Services employee. (Id.; Docket No. 15-9). Vail did not consider herself an independent contractor. (Docket No. 15-2, ¶¶ 3, 6). On May 25, 2013, Vail's thumb was crushed while she was working for S/L Services at a construction site near Watford City, North Dakota. (Docket Nos. 1, ¶ 5; 15-2, ¶ 1). Vail alleges that the injury occurred when an S/L Services employee using a forklift to carry a piece of pipe dropped the pipe on Vail's thumb. (Id.).

On June 5, 2013, a "First Report of Injury" identifying Vail as the worker and S/L Services as her employer was submitted to WSI. (Docket No. 15-8). S/L Services' office manager, Whitney Becker, filled out the portion of the report to be completed by the employer. (Id.). In response to the statement "If you question this claim, state reason," Becker wrote, "Dawn Vail is a subcontractor not an S/L Services, Inc. employee." (Id.).

WSI determined that Vail was an S/L Services employee and awarded her WSI benefits. (Docket No. 15-4). In a "Notice of Decision Establishing Employee Status and Accepting Claim and Awarding Benefits," dated July 10, 2013, WSI advised that it "ha[d] determined S L Services

Inc is an employer of Dawn Vail and any similarly situated workers and awarded benefits." (Id.). The notice further stated that "[p]ursuant to North Dakota Century Code § 65-04-33 S L Services Inc . . . is ordered to submit all wages for all employees including Dawn Vail, and any similarly situated employees, to WSI for the previous six (6) years" and that S/L Services could request reconsideration of the decision within 30 days. (Id.). S/L Services apparently did seek review of WSI's decision. The manner in and extent to which the decision was reviewed is unclear from the record.[1] However, nothing before the court indicates that WSI's decision was reversed or that review of the decision is pending.

On August 22, 2013, S/L Services submitted its "Employer Payroll Report" for the period from August 23, 2012 to August 31, 2013. (Docket No. 9-4). To complete the report, S/L Services was required to provide the name, classification, and payroll information of each of its employees. (Id.). S/L Services did not list Vail as an employee. (Id. at p. 6). On September 6, 2013, WSI issued S/L Services a "Premium Billing Statement" that included an additional charge of $4,100.49 for the period from August 23, 2012 to August 31, 2013.[2] (Docket No. 9-5). S/L Services paid the premium by check dated September 12, 2013. (Docket No. 9-5, p. 3).

---

[1] The only document in the record indicating that S/L Services requested review of WSI's decision is a November 18, 2013 letter from S/L Services' CPA Robert Fladmo to WSI. (Docket No. 15-9). The letter indicates that it is in response to WSI's letter dated October 31, 2013. (Id.). No WSI letter with that date is included in the record. In Fladmo's letter, he explains why S/L Services believes that Vail was an independent contractor rather than an S/L Services employee. (Id.).

[2] S/L Services reported that it had 74 employees and that the value of its payroll was $1,022,324.29 when the $27,900 per employee payroll cap was applied. (Docket No. 9-4). However, the value WSI used for S/L Services' payroll when it assessed the additional premium was increased by $42,880.00 to $1,065,204.29. (See Docket Nos. 9-5, p. 2; 15-6, p. 2). Neither party noted this change in its briefing, and the reason WSI adjusted the payroll amount is not clear from the record.

On April 1, 2014, WSI audited S/L Services for the period from August 23, 2012 through August 31, 2013, *i.e.*, the period of Vail's injury. (Docket No. 15-6). WSI's "Audit Remarks and Message" discussing the audit stated, in part:

> The business issued 24 1099s during the audited period totaling $665,189.38. They were issued for the services of welding. The 1099s were reviewed closely as per the notes on the account, an individual reported a claim under this account and was claiming to be an employee while the employer stated they were a 1099 individual. After much review with these 1099s, it was determined we will be picking up the individuals that do not have a contract on file with the employer, are not currently listed as employees of the company, and do not have a business name. Many detailed questions were asked to the employer to get a better understanding of these individuals and the burden of proof was not met to treat them as independent. For this reason, these individuals were picked up as employees. See Payroll Cap Worksheet None to 6301.

(Docket No. 15-6, p. 5). The payroll cap worksheet included with the audit materials lists the name, class, and wages of seven individuals who were picked up by WSI. (Id. at p. 4). Vail is not on that list. (Id.). On June 20, 2014, WSI sent S/L Services a "Notice of Decision" advising that, as a result of the audit, S/L Services would be charged an additional premium for the audit period and for the period from September 1, 2013 to August 31, 2014. (Docket No. 18-2). It is unclear from the record whether S/L Services was billed for or paid a WSI premium that covered the wages it paid Vail during the period of her injury.

## II.    DISCUSSION

### A.    Summary judgment standards

S/L Services' "Motion to Dismiss" relies on matters outside the pleadings and will be treated as a motion for summary judgment.[3] See Fed. R. Civ. P 12(d) ("If, on a motion under Rule 12(b)(6)

---

[3] After S/L Services filed its "Motion to Dismiss," the parties executed a "Stipulation to Stay Consideration of Motion and Allow Discovery." See Docket No. 13. The parties agreed (1) that S/L Services' motion presented matters outside the pleadings and should be treated as a motion for summary judgment, (2) that plaintiff would be permitted to conduct discovery before responding to the motion, and (3) that the parties' briefing deadlines would be

or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."). The standards governing summary judgment are well known to the court and need not be repeated here. <u>See</u>, <u>e.g</u>, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986); Fed R. Civ. P. 56. North Dakota substantive law governs this diversity action. <u>Commercial Res. Grp., LLC v. J.M. Smucker Co.</u>, 753 F.3d 790, 793 (8th Cir. 2014).

**B.     Exception to the general rule that WSI benefits are an exclusive remedy**

It is well established that the North Dakota workers' compensation scheme generally makes WSI compensation an injured employee's exclusive remedy against an employer. <u>E.g.</u>, <u>Richard v. Washburn Pub. Sch.</u>, 2011 ND 240, ¶ 13, 809 N.W.2d 288 (quoting <u>Mitchell v. Sanborn</u>, 536 N.W.2d 678, 683 (N.D. 1995)) ("The Workforce Safety and Insurance Act 'generally provides the exclusive remedy for an employee who suffers a compensable injury.'"); <u>Zimmerman by Zimmerman v. Valdak Corp.</u>, 1997 ND 203, ¶ 9  n.1, 570 N.W.2d 204 (identifying four WSI "exclusive remedy" provisions at N.D.C.C. §§ 65-01-01, 65-01-08, 65-04-28, and 65-05-06).

An exception to this general rule is codified in the Workforce Safety and Insurance Act at Chapter 65-09 entitled "Proceedings by Injured Employee Against Uninsured Employer." The two provisions in that chapter provide, in relevant part:

**§ 65-09-01.  Liability of uninsured employer for injury to employees**

1.  Any employer subject to this title who is in violation of subsection 1 or 2 of section 65-04-33 or declared uninsured pursuant to section 65-04-22 is not protected by the immunity from civil liability granted to employers under this title for injuries to that employer's employees for damages suffered by reason of injuries sustained in the course of employment. . . .

---

extended to allow time for discovery. <u>Id.</u>

6

. . . .

### § 65-09-02.  Application for compensation--Common-law defenses not available--Fund subrogated to recovery--Hearing--Time for filing

An employee whose employer is in violation of section 65-04-33, who has been injured in the course of employment . . . may file an application with the organization for an award of compensation under this title and in addition may maintain a civil action against the employer for damages resulting from the injury. . . .  In the action, the employer may not assert the common-law defenses of:

      1.  The fellow servant rule.

      2.  Assumption of risk.

      3.  Contributory negligence.

The organization is subrogated to the recovery made in the action against the uninsured employer. . . .

In short, N.D.C.C. § 65-09-02 provides that the dual remedies of collecting WSI benefits and bringing a civil action are available to an injured employee "whose employer is in violation of section 65-04-33[.]"  See Gepner v. Fujicolor Processing, Inc. of Sioux Falls, S. Dakota, U.S.A., 2001 ND 207, ¶ 18, 637 N.W.2d 681 ("Gepner") (stating N.D.C.C. ch. 65-09 permits an employee of an uninsured employer to recover WSI benefits and to sue the employer in tort).  The relevant provisions of § 65-04-33 are set forth in detail later.  Generally speaking, however, the section prohibits an employer from doing certain things, including failing to secure WSI coverage for employees and misrepresenting the amount of payroll upon which its premiums are based.  The section also establishes penalties for violation of these and other requirements set forth in the Workforce Safety and Insurance Act.

### C. The parties' arguments

#### 1. S/L Services' arguments based on the general rule that WSI benefits are an exclusive remedy

In the memorandum in support of its motion, S/L Services summarizes its argument by stating that "by statute and case law in North Dakota, an employer who has paid its premiums for WSI coverage, and anyone who is deemed an 'employee' by WSI and receives payment for medical care and wage loss cannot commence a civil action against the employer." S/L Services cites two North Dakota statutes, N.D.C.C. §§ 65-04-04 and 65-01-08, in support of its argument. The portions of the statutes S/L Services cites provide:

### § 65-04-04. Employers obligated to pay premiums--Premium and certificates to be mailed

Each employer subject to this title shall pay into the fund annually the amount of premiums determined and fixed by the organization for the employment or occupation of the employer. The amount must be determined by the classifications, rules, and rates made and published by the organization and must be based on a proportion of the annual expenditure of money by the employer for the service of persons subject to the provisions of this title. The organization shall mail to the employer a certificate specifying that the payment has been made. The certificate, attested by the seal of the organization, is prima facie evidence of the payment of the premium. . . .

### § 65-01-08. Contributing employer and staffing service relieved from liability for injury to employee

1. If a local or out-of-state employer secured the payment of compensation to that employer's employees by contributing premiums to the fund, the employee, and the parents in the case of a minor employee, or the representatives or beneficiaries of either, do not have a claim for relief against the contributing employer or against any agent, servant, or other employee of the employer for damages for personal injuries, but shall look solely to the fund for compensation.

S/L Services also cites two North Dakota Supreme Court cases for the general rule that WSI provides an injured employee's exclusive remedy against an employer.

S/L Services, however, neglects to mention material facts that are relevant to determining whether Vail is entitled to pursue a civil action pursuant to ch. 65-09 because of one or more possible violations of § 65-04-33–a subject that S/L Services did not address in its opening memorandum and to which the court must now turn.

### 2.     Vail's arguments for violation of  § 65-04-33

#### a.     Introduction

As noted earlier, § 65-09-01 states employers forfeit their immunity from civil liability for injuries sustained by employees if they are "in violation of subsection 1 or 2 of section 65-04-33." Section 65-09-02 then goes on to provide that "[a]n employee whose employer is in violation of section 65-04-33, who has been injured in the course of employment . . . may file an application with the organization for an award of compensation under this title and in addition may maintain a civil action against the employer for damages resulting from the injury."

Notably, § 65-04-33 includes 5 subsections.  Based on the plain language of the two provisions in Chapter 65-09, it is unclear whether dual remedies are available for violations of subsections 3 to 5 of § 65-04-33.  However, the court need not resolve this uncertainty because the possibility that S/L Services violated subsections 1 and 2 is all that is required to dispose of the motion now before the court.

Vail claims there are material facts in dispute with respect to whether S/L Services violated subsections 1 and 2 of § 65-04-33.[4]  S/L Services disagrees, disputing how the relevant language is

---

[4] Vail contends that these issues must be resolved by the jury.  At this point, the court is not so sure.  While Vail is certainly entitled to a jury determination on her common law claims for injury (assuming no statutory workers' compensation immunity), that may not be the case for the determination of whether the statutory immunity applies.  In federal diversity actions, the right to a jury trial is governed by the Seventh Amendment and the question is whether the issues are of the type that were triable to a jury at common law, which requires a two-step inquiry.  See Kartch v. EOG Resources, Inc., No. 4:10-cv-014, 2010 WL 4260103, at **3-4 (D.N.D. Oct. 22, 2010).

to be construed and applied. Before turning to the details, it is helpful first to consider the following guidelines for statutory interpretation recently set forth by the North Dakota Supreme Court:

> "The primary purpose of statutory interpretation is to determine legislative intent." Teigen v. State, 2008 ND 88, ¶ 19, 749 N.W.2d 505 (citing Estate of Elken, 2007 ND 107, ¶ 7, 735 N.W.2d 842). In doing so, "[t]he Legislature's intent must be sought initially from the statutory language." District One Republican Comm. v. District One Democrat Comm., 466 N.W.2d 820, 824 (N.D. 1991) (citation omitted). "If the language of a statute is clear and unambiguous, the letter of the statute cannot be disregarded under the pretext of pursuing its spirit because the legislative intent is presumed clear from the face of the statute." Stutsman Cnty. v. State Historical Society, 371 N.W.2d 321, 325 (N.D. 1985) (citations omitted). "Words . . . in a[ ] statute are to be understood in their ordinary sense, unless a contrary intention plainly appears . . . ." N.D.C.C. § 1-02-02. But, if the statute is ambiguous or of doubtful meaning, we may look to extrinsic aids to interpret the statute. Teigen, at ¶ 19; District One Republican Comm., 466 N.W.2d at 825.

Olson v. Job Serv. N. Dakota, 2013 ND 24, ¶ 5, 827 N.W.2d 36.

### b. Whether S/L Services was in violation subsection (1)

Section 65-04-33(1), N.D.C.C., provides:

1. An employer may not employ any person, or receive the fruits of the labor of any person, in a hazardous employment as defined in this title, without first applying for workforce safety and insurance coverage for the protection of employees by notifying the organization of the intended employment, the nature of the intended employment, and the estimated payroll expenditure for the coming twelve-month period.

Considering only the language of subsection 1, it appears two constructions are possible. One is that it requires only that an employer complete an application for WSI coverage and obtain some coverage. This is the construction advanced by S/L Services. The second possibility is that, in addition to requiring employers to establish WSI accounts, subsection 1 creates a continuing obligation for employers to apply for WSI coverage for each employee hired. This appears to be Vail's construction.

The problem with Vail's interpretation, however, is that it does not fit very well with WSI's reporting requirements, which, as already discussed, contemplate: (1) an employer establishing a WSI account and paying a premium in advance for the next 12-month period, based upon an estimate of the number of employees to be hired and their classification; and (2) a retroactive adjustment of the premium, upward if the estimate was too low or downward if the estimate was too high, at the end of the 12-month period. That is, unless as Vail suggests, subsection 1 itself can be read as requiring an employer to separately report to WSI each time an employee is hired and before the employer takes advantage of the fruits of the employee's labor, the name of the employee, a description of the work the employee will be performing, and the amount of wages to be paid to the employee.

Although Vail's interpretation is a plausible one, it appears the North Dakota Supreme Court has concluded that WSI has some flexibility in this matter and, so long as WSI itself does not require that an employer notify WSI each time an employee is hired and provide the above information, the only obligation imposed by subsection 1 is to open an account and secure some insurance. Courchene v. Delaney Distributors, Inc., 421 N.W.2d 811, 815 n.4 (N.D. 1988) (construing an earlier version of the same requirement codified at N.D.C.C. § 65-01-05, which was repealed when § 65-04-33 was adopted).[5] And, if that is all that subsection 1 requires, then it appears there was no violation in this case since S/L Services did do that. In other words, it does not appear that S/L

---

[5] Vail cites to <u>Gepner</u>, 2001 ND 207, 637 N.W.2d 681, as requiring that an employer separately secure coverage for each employee by giving notice to WSI when the employee is added. In <u>Gepner</u>, the North Dakota Supreme Court concluded the employer was subject to the dual remedies of WSI benefits and a common law civil action because of a failure to secure WSI coverage for the plaintiff. But, while the facts are not entirely clear, it appears the plaintiff was a South Dakota employee who was doing some work in North Dakota and the employer had not opened a WSI account to cover work being performed in North Dakota by any of its employees. Hence, <u>Gepner</u> does not appear to be on point.

Services violates subsection 1 if, after establishing a WSI account and purchasing some insurance, it underreports its payroll for premium calculation purposes by having improperly treated Vail as an independent contractor instead of as an employee.

That being said, the North Dakota Supreme Court's reasoning in <u>Courchene</u> is somewhat difficult to follow and may be confined to the facts of that case. Also, it appears the Court left open the possibility that WSI could require an employer to provide it notice each time an employee is hired so that, if a person is hired and notice is not given (because, for example, the employer is treating the person as an independent contractor), the employer would be treated as having not secured WSI coverage for that person. And, if such a procedure is employed, then, perhaps, subsection 1 would be violated if S/L Services failed to report Vail's name and other pertinent information when she was hired and it is later determined S/L Services should have reported Vail as an employee because it improperly treated her as an independent contractor.

The court does not believe it has been fully informed with respect to WSI's current procedures– particularly whether or not it requires reporting new employees as they are added. Also, WSI may have a construction of this subsection that the court should consider and give whatever deference is appropriate under North Dakota law. Consequently, the court will reserve judgment as to whether subsection 1 of § 65-04-33 has any applicability in this case.

### c. Whether S/L Services was in violation subsection 2

#### i. Introduction

Section 65-04-33(2), N.D.C.C., provides, in relevant part:

2. An employer who willfully misrepresents to the organization or its representative the amount of payroll upon which a premium under this title is based, or who willfully fails to secure coverage for employees, is liable to the state in the amount of two thousand dollars plus three times the difference

12

between the premium paid and the amount of premium the employer should have paid. The organization shall collect a penalty imposed under this subsection in a civil action in the name of the state, and the organization shall deposit a penalty collected under this subsection to the credit of the workforce safety and insurance fund. . . .

Notably, this section goes on to provide a full complement of enforcement mechanisms that WSI can use to prevent what Vail claims occurred in this case, *i.e.*, S/L Services purportedly having improperly treated a number of persons working for it, including Vail, as independent contractors to avoid having to undertake the obligations that come with hiring employees, including paying WSI premiums in an amount reflecting the persons as employees. Nevertheless, despite the remedies set forth in subsection 2 itself, it is clear the North Dakota Legislature intended to add another penalty for a violation of the subsection, that being subjecting employers who violate it to the loss of immunity from civil liability under ch. 65-09 since, as previously noted, § 65-09-01 expressly provides that "[a]ny employer subject to this title who is in violation of subsection 1 or 2 of section 65-04-33 is not protected by the immunity from civil liability granted to employers under this title . . . ," and § 65-09-02 also references violations of § 65-04-33.

In response to Vail's reliance upon subsection 2, S/L Services appears to make two arguments for why it does not apply. The first is that there can be no violation because once it opened an account and paid some premium, Vail was always entitled to WSI coverage if she demonstrated she was in fact an employee. The second is that WSI concluded that S/L Services had not violated § 65-04-33(2) and that this determination is binding upon Vail.

### ii. S/L Services' argument that there is no liability under subsection 2 because it established a WSI account

Turning to S/L Services' first argument, while it may be that a violation of subsection 1 gives rise to the possibility of the loss of immunity from an employee's civil action only where an

employer has failed to open a WSI account and secure some insurance, this does not appear to be the case with respect to subsection 2. In other words, the simple opening of an account and paying some insurance premium will not provide an employer with safe harbor in all instances where thereafter it does not properly treat one or more persons working for it as employees and underreports its payroll for premium-reporting purposes as a consequence.

There are at least two reasons this appears to be the case. <u>First</u>, if the intent of the statutory scheme was to penalize the employer in terms of applying the dual-remedy provisions of ch. 65-09 only in those situations where the employer failed to open an account and pay some premium, then the explicit reference to subsection 2 of § 65-04-33 in § 65-09-01(1) would appear to be superfluous. A reference to only subsection 1 would do.

Or, to state it somewhat differently, the reference in § 65-09-01(1) to subsection 2 could very well have been intended to cover, among other things, the gap that otherwise would exist if all the employer had to do was secure some coverage by paying premiums for a handful of employees and employing scores of others as "independent contractors." Then, if an "independent contractor" was injured, the employer could list the "independent contractor" after the fact as an employee in the next 12-month payroll report and pay an adjustment in the premium if the employer felt exposed to civil liability. Or, if no injury occurred or the employer did not feel exposed to civil liability if an injury did occur, the employer could omit the "independent contractor" in the next 12-month payroll report, avoid the premium adjustment, and contest any claim for WSI benefits that may be filed by the "independent contractor." In other words, "play with the house money" until an injury occurs and then decide what is the best strategy.

Second, subsection 2 goes on to provide for liability in the event of a violation that includes having to pay additional amounts of premium based upon the difference between what the employer paid and what it should have paid. This language indicates that the reach of what is a violation under subsection 2 extends not just to the failure to open an account and pay some premium but also to when an employer underreports those who should be treated as employees for premium purposes or otherwise fails to secure coverage for individual employees.

That being said, there does appear to be a number of practical difficulties in applying the dual-remedy provisions of ch. 65-09 to violations of subsection 2 given the manner in which WSI assesses and collects it premiums. For example, if a person hired to work is treated for several years as an independent contractor with the worker's name not being included in the annual reports of payroll for premium-adjustment purposes and an accident happens, there would appear to be a good argument for the employer having violated subsection 2 if it was determined that the worker should have been treated as an employee all along. But, what about the situation (which appears to be the case here) where an employer hires a worker between reporting periods, treats the person as an independent contractor, and the person is injured before the first annual 12-month report is due? Does the mere fact that the employer has treated the worker as an independent contractor necessarily imply it intended to do so for purposes of WSI coverage, so that it amounts to a failure to secure WSI coverage for the worker within the meaning of subsection 2 if the worker is determined to have actually been an employee, even though no payment was yet due for premium based on the worker being on the payroll? What if the worker in this situation can demonstrate that the employer had treated other similarly situated workers as independent contractors and failed to include their wages in prior payroll reports? Further, what happens if, following the injury to the worker treated as an

independent contractor, the employer reports the wages for the injured worker as part of the retroactive premium adjustment, does the employer then get a "free pass" even if the worker could demonstrate by a preponderance of the evidence the employer would not have reported the wages but for the occurrence of the injury?

Also, what about the situation (which may also be the case here) where the worker's injury occurred between reporting periods but, when it came time for the annual premium adjustment, the employer still did not report the worker's wages as part of its payroll report, choosing instead to stand pat on its position the worker was an independent contractor? Does the fact that WSI later audited the employer and made it retroactively pay the premium for the reporting period in which the accident took place and the wages were not included in the premium adjustment, cure the initial noncompliance for purposes of applying the dual remedy of loss of immunity from civil liability?

Finally, what if the worker, who has been treated as an independent contractor, makes a claim for WSI coverage and the employer contests it (which again may be the case here)? Is that *ipso facto* a failure to secure coverage? If not, is the employer estopped from being able to claim that the worker was an employee for purposes of avoiding the immunity otherwise provided by the Workforce Safety and Insurance Act?

While there do not appear to be any North Dakota cases on point, the court concludes that, at least in the situation where (1) the employer treated a person as an independent contractor, (2) the injured person's wages were not included in the report for the adjustment of premium for the period in which the injury occurred, and (3) the person should have been treated by the employer as an employee, the employee has the opportunity to pursue the dual remedy of civil liability if the employee can establish that the failure to include his or her wages as part of the payroll for premium

16

adjustment purposes covering the time period of the injury was done "willfully" within the meaning

of subsection 2. For purposes of S/L Services present motion, this is enough to deny it based upon

its first argument that opening an account and securing some coverage is sufficient.[6]

> ### iii. S/L Services' argument that WSI determined it was not in violation of any WSI requirements and that Vail is bound by that determination

S/L Services argues that WSI's decision not to assess S/L Services a penalty following the

audit conclusively establishes that it did not violate § 65-04-33(2) and supports its argument with

a chain of emails between its office manager, Whitney Becker, and WSI Premium Auditor Amanda

Booke. The first is a June 2, 2014 email from Booke to Becker in which Booke provided S/L

Services' WSI audit results. (Docket No. 18-3). Becker replied in an email dated June 3, 2014, that

provides:

---

[6] There may be other ways in which subsection 2 was violated in this case, but, before deciding, the court would prefer further briefing on the subject as well as, perhaps, more facts. Also, WSI may have a position on this matter that is not reflected in the current record. That being said, it appears Vail has a compelling argument that S/L Services' opposition to her application for benefits on the grounds she was an independent contractor, particularly after treating her as such, was an *ipso facto* failure to secure coverage within the meaning of subsection 2. Cf. Muffet v. Royster, 147 Cal.App.3d 289 (Cal. Ct. App. 2d Dist. 1983), abrogated on other grounds, Cornette v. Department of Transp., 26 P.3d 332 (Cal. 2001) (concluding that the employer's withholding from an employee's pay amounts to cover the cost of workers' compensation coverage was a failure to secure coverage that, in turn, permitted the employee to bring a civil action for damages).

Also, there is much to be said for the argument that any time an employer treats a person performing work for it as an independent contractor, the employer is estopped from claiming the person is an employee–at least absent some evidence from the employer that it has actually treated the person as an employee for workers' compensation purposes. In fact, there is statutory language that not only supports applying such a rule, but also mitigates any perceived harshness in doing so. See, e.g., N.D.C.C. §§ 31-11-06 (estoppel), 65-04-22.1, & 65-09-01(2).

More particularly, § 65-04-22.1 provides that an employer can obtain a safe-harbor determination from the North Dakota Department of Labor that a person is an independent contractor, which is binding upon the WSI for some purposes. And, although this section does not specifically reference the dual-remedy provisions of ch. 65-09, an employee seeking to sue civilly would likely have a difficult time if the employer has obtained a safe-harbor determination from the Department of Labor. Also, even more to the point, § 65-09-01itself provides in subsection 2 that WSI may establish a procedure whereby an advance determination can be obtained as to whether a person is an employee or an independent contractor that would be binding for a twelve-month period and that likely, given its placement in ch. 65-09, would prohibit the dual remedy of a civil action. In fact, the procedure that WSI may have decided to employ for that determination is one made by the Department of Labor as provided for § 65-04-22.1.

Hi Amanda,

Thank you for your email of June 2 where you provided us with your audit results. A couple of questions:

(1)     Does this mean that S/L Services has done something wrong with our ND Workforce reporting or just that an adjustment was necessary?

(2)     Will we be getting a bill for the $4638.61 and will that be the total amount?

(3)     We understand that Dawn Vail is insured through our ND Work Force account for the injuries she sustained back in May of 2013 is that correct?

Just trying to make sure that I understand the audit results etc. Can you please let me know?

Thanks,
Whitney

(Id.).  Booke replied the same day in an email that provides:

ND WSI has picked up additional individuals (the 1099s) as employees per the information that was sent to me along with the decision that was made with Dawn. All of these individuals, WSI considers employees and are insured with us.  If you have any questions, please call me.  Also, you will be receiving a bill from WSI in the next couple weeks once it is run through the system and applies the corresponding discounts/surcharges that are currently on your account.

Amanda Booke
WSI Premium Auditor

(Id.).  Becker replied in a June 6, 2014 email that provides:

Amanda,

I just want to be clear in my understanding of what you said below:

(1)     Dawn Vail is covered and has work force insurance through our account.

(2)     SL Services is not getting penalized for doing anything wrong or incorrect with respect to our ND work force reporting.

> (3)    We will be getting a bill for a reclassification of certain people as you mention in your audit.
>
> Thank you,
> Whitney

(Id.).  Booke replied, "Yes all three of those statements are correct."  (Id.).

S/L Services takes the position not only that the above email exchange, combined with the fact that S/L Services was not assessed a monetary penalty,[7] demonstrates that WSI determined S/L Services had not violated § 65-04-33(2), but also that this is binding upon Vail in terms of her being able to pursue the dual remedy of a civil action for damages.  The court is not so sure.

To begin, the court is not convinced that the email exchange establishes that Booke determined S/L Services had not willfully misrepresented its payroll information or willfully failed to secure coverage for its employees, including for Vail during the premium period when the accident took place.  Among other things, one or more of Booke's responses to the vague and somewhat leading questions (apparently posed after this action began) could relate to what occurred during subsequent reporting periods.  Further, even if Booke made the determination that no penalty would be assessed for S/L Services' actions during the relevant time period, that does not mean she necessarily determined no violation of § 65-04-33(2) had taken place, much less that she was a person authorized to make a final determination on behalf of WSI with respect to that matter.

---

[7] The court assumes based on the representations in S/L Services' reply brief that S/L Services was not assessed a penalty pursuant to § 65-04-33(2).  However, that is not clearly established by the record.  S/L Services apparently relies on the email exchange between Booke and Becker and, perhaps the Premium Billing Statement it received following the audit, to show that no penalty was assessed.  See Docket Nos.18-2 to 18-3.  While Booke's last email certainly suggests S/L Services would not be penalized pursuant to § 65-04-33(2), the court cannot be certain that is what Booke meant when she affirmed that S/L Services was "not getting penalized."  Further, while the bill S/L Services received following the audit does not include any penalty charges, it does not affirmatively state that no penalty would be assessed.

In fact, the court is not even convinced about the premise of S/L Services' argument that WSI determined no violation of § 65-04-33(2) had occurred given the absence of a penalty–the premise being that § 65-04-33(2) required WSI to assess a penalty. The language that S/L Services relies upon for such a requirement is the following sentence:

> The organization shall collect a penalty imposed under this subsection in a civil action in the name of the state, and the organization shall deposit a penalty collected under this subsection to the credit of the workforce safety and insurance fund.

N.D.C.C. § 65-04-33(2). While S/L Services' reading of this language is one possible interpretation, another equally plausible reading is that the "shall collect . . . shall deposit" language was intended to make mandatory only the *manner* of collection and disposition of "a penalty imposed" but not to make the imposing of the penalty mandatory.

Based on the record before it, the court simply cannot tell why S/L Services was not required to pay a monetary penalty. It may have been that Booke or even WSI simply decided to cut S/L Services a break, even if WSI was required to assess a penalty. It may also have been because their reading of the statute was that the collection of the penalty was permissive.

Further, even assuming WSI decided § 65-04-33(2) was not violated, the court is not convinced this would necessarily be dispositive for purposes of determining whether Vail is entitled to pursue this action pursuant to § 65-09-02. Reading the two statutes together, it appears it is the willful misrepresentation of the amount of payroll upon which the premium is based or the willful failure to obtain WSI coverage that are the predicate for a loss of immunity from a civil action brought by an employee and not WSI's determination that either has occurred.

In summary, the court is not prepared to conclude that WSI's purported failure to assess a penalty is dispositive of whether S/L Services violated § 65-04-33(2) for purposes of determining

whether Vail can pursue the dual remedy of a civil action pursuant to § 65-09-02. Even if it could be dispositive, which the court doubts, there are too many unknowns at this point for the court to reach that conclusion.

### D.  Conclusion

Based on the evidence submitted by Vail and the other uncontested facts in the record, the court concludes that S/L Services has failed to demonstrate it is entitled to dismissal on the grounds set forth in its motion to dismiss, which the court has treated as a motion for summary judgment. Further, the court concludes there are material questions of disputed fact with respect to whether S/L Services violated § 65-04-33(2) by willfully misrepresenting its payroll information and possibly also willfully failing to secure coverage for Vail.[8]

## III.  ORDER

For the reasons stated above, S/L Services' "Motion to Dismiss" (Docket No. 8) is **DENIED**.

Dated this 25th day of March, 2015.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr., Magistrate Judge
United States District Court

---

[8] The North Dakota Supreme Court has stated that as used in § 65-04-33(2), willful conduct means "conduct engaged in intentionally and not inadvertently." Muldoon v. ND Workforce Safety & Ins. Fund, 2012 ND 244, ¶ 13, 823 N.W.2d 761 (quoting Forbes v. Workforce Safety and Ins. Fund, 2006 ND 208, ¶ 13, 722 N.W.2d 536). The court has further stated that, "[a] state of mind can rarely be proven directly and must usually be inferred from conduct and circumstantial evidence." Id. While the court makes no final ruling now, this would suggest only the need for purposeful conduct and not any special state of mind, such as acting with a bad purpose or with the intent to deceive or defraud. But, even if some higher state of mind is required, there is at least a fact issue whether S/L Services acted more than just intentionally based on the circumstantial evidence, including the affidavit of Steve Basse, an S/L Services welder during the time period in question, who claims he spoke with his superior about the impropriety of classifying Vail and other welder's helpers as independent contractors and that his superior, "refused to consider what [Basse] told him, and insisted S/L was going to handle it the way they wanted." (Docket No. 15-3).